IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MARCO ANTONIO TORRES RUBIO                                    PLAINTIFF

        v.                        Civil No. 07-5156

DEPUTY LARKIN, Benton County
Detention Center; and DEPUTY COLLINS,
Benton County Detention Center                               DEFENDANTS


**<u>MEMORANDUM OPINION</u>**

This is a civil rights case filed under 42 U.S.C. § 1983.  The Plaintiff proceeds *pro se* and

*in forma pauperis.*  The case is before the Court for decision pursuant to the consent of the

parties (Doc. 46).

In this case, Plaintiff alleges that Defendants Dana Larkin and Casey Collins, deputies

at the Benton County Detention Center (BCDC), used excessive force against him on August 8,

2007.  A bench trial was held on February 16, 2010.  The Plaintiff also has a second case *Rubio*

*v. Dr. Huskins*, Civil No. 08-5011.  In case 08-5011, Plaintiff alleges the Defendant, Dr. John

Huskins, denied him adequate medical care.  For the ease of the parties and the Court, the bench

trials of the two cases were held simultaneously.

At the conclusion of the trial, Defendants were directed to provide the Court with:  the

records missing from Plaintiff's jail medical record; copies of Plaintiff's requests/grievances

dated December 16, 2007, and December 27, 2007; and, a complete copy of Plaintiff's

medication logs.  The case was taken under advisement pending receipt of these documents and

preparation of this memorandum opinion.

-1-

## I.  EVIDENCE PRESENTED

The Court heard the testimony of the following individuals:  (1) Marco Antonio Torres Rubio, the Plaintiff; (2) Joe Arreola (telephonic testimony); (3) Maci Davis (telephonic testimony); (4)  Shawn Sarver (telephonic testimony); (5) Elmer Rodriguez (telephonic testimony); (6) Dr. John Huskins, the named Defendant in Civil No. 08-5011; (7) Nurse Marsha Smith; (8) Deputy Larkin, a named Defendant in Civil No. 07-5156; and (9) Deputy Collins, a named Defendant in Civil No. 07-5156.  The testimony of these witnesses will be summarized in the first person.

### *Marco Antonio Torres Rubio*

I was incarcerated at the BCDC from April of 2007 until January of 2008.  I am currently in federal prison in Marion, Illinois.

On August 8, 2007, early in the morning, about 7 or 8 a.m.,  I approached the door to ask for toilet paper to use in the restroom.  I was inside the pod standing at the door.

Larkin opened the door; other officers were there too.  I asked if they could give me toilet paper to use in the restroom.  Larkin said no.

I said I needed to use the restroom.  Then I asked the officers if they could open my room because I had toilet paper in my room.

Larkin and Collins charged in and put me on the floor.  Larkin hit me on one side of the face.  He grabbed me with one hand and hit me with the other.  He threw me on the floor.  He started hitting and kicking me.  I was hit in the head and then they started hitting and kicking me all over my body and head.  I was receiving a lot of kicks from all of them.

-2-

I covered my face and curled up in a ball.  I was hit and kicked a lot.  There were other officers involved but I cannot identify them.  I did not see them.  I am not sure if the other officers hit me.  When they picked me up, there were a lot of officers there.

Collins then started handcuffing me.  My arms were handcuffed behind my back.  Once I was handcuffed, they had me on my knees.  Larkin kept hitting me in the head.  He hit me ten or fifteen times in the head.  He also kicked me right above my left testicle.  Larkin was yelling at me, cursing me, and calling me a mother f-----.   Larkin was upset.

Collins was grabbing me by the shoulders.  He was holding me on my knees while Larkin was hitting me in the head.  I never said or did anything.  I was taken to the hallway and put on my knees.  Collins was there.  Larkin went to the computer because he was going to put me in the hole.  Larkin came back.  He said Mexican mother f----- and started hitting and cursing me again.  Collins lifted me up and I was then taken to the place they call the hole.

Larkin has that way of behaving there.  I do not know why; maybe he does not like his job or does not like Hispanics.

It all happened really fast.  They picked me up and handcuffed me and took me outside.  Collins was holding me by the arms and Larkin was hitting me in the head.

I never refused to do anything on August 8th.  I was simply asking for a roll of paper.  They never gave me any order.  Larkin just came after me.  I did not resist.  I had been there for several months.  I saw how they hit people.  I knew it would be worse if I resisted.  I have seen Larkin hit others.  I saw him hit a man known as Pinocchio but he has been deported.

At lunch time, Larkin came and threatened me.  He put his fist in my face when they were giving food out.  Because I do not speak English well, I did not understand everything he said.  I stayed in the hole about ten days.  They put me in the hole and said I was guilty.

-3-

When I started having pain in my head, back, chest, and left testicle, I put in a medical request. I sent in the first medical request either the day it happened or the next day.

I was not bleeding, I had knots on my head and body and bruises. At the BCDC, it takes three or four days to get a request and then go to see the doctor. It was about a week afterwards that I waited to get pain medication.

I went to see the doctor to get checked. I told him what happened. I showed the doctor all my bruises and bumps and about my contact with the deputies.

When the doctor saw me, he only lifted my arms and gave me pills. He did not want to give me a more in-depth examination because I was having a lot of pain all over my body, head, chest, and left testicle.

I asked the doctor to do an in-depth examination and to do x-rays to check. I told him I felt I had something wrong on the inside. He never checked me. He only gave me pain medication. He said nothing was wrong.

Sometimes after I saw him, I received pain medication. I received pain medication [acetaminophen] from August 13th to August 18th. *Defendants' Exhibit* 3 in Civil No. 08-5011. The medication did not help much. A couple of days later, he stopped giving me medication. This is the reason I had to put in a lot of requests.

I had surgery on my stomach after being shot in the back and the leg when I was about seventeen. I think that is why all the blows affected me because I was weak. I did not have pain before the August 8th incident. The pain did not start until after they hit me.

When I saw the doctor again, he gave me more medication. Sometimes they gave me medication and sometimes not. The last few times I saw him, he would not give me any medication. It was a struggle there. Sometimes I did not even have my medication for diabetes.

-4-

The longest period I went without my diabetes medication was one and one-half to two weeks.  This happened often.  My attorney even sent them an e-mail about the medication.  I do not know if the times I did not have the medication was a result of the doctor not giving it or if the guards did not give it to me.  I would go and ask for my medication and they would say:  "There is nothing here for you."

When I did not get my diabetes medication, I felt very hot, I could not see, and what I could see was dark.  Other diabetics told me to drink lots of water and walk.

I told the doctor I was not receiving my diabetic medication maybe four or five times.  Once he said he would order the medication and it took several days.  The second time, he said he would order the medication.  After I told him, I started receiving it a few days later.  The third time I asked him, he again said he was going to order it and I started receiving it some days later.  When my attorney got involved was when I started receiving it.

Sometimes when I put in a request to see the doctor, they would not call for me.  Other times, three or four times, I saw the nurse.  There were times I just got my request back and was not seen.  When you went to see the doctor, you would tell them one thing and they would try to get you out of there.

I still have pain in half of my face, my head, my chest, my left leg, and between my belly button and left testicle.  I also have throbbing pain in my left testicle and my back.  Sometimes the pain is really strong and sometimes it is not.  Since leaving the BCDC, I have been in detention centers in Arkansas, Illinois, and Georgia.  I have seen numerous doctors and nurses, but no one has checked me in depth.  I think I still need an x-ray of my head and body.  When I was in Atlanta, they took an x-ray – I think to check for tuberculosis – but I never got the results.  I have been

-5-

taking pain pills for three years.  In the morning, I take two pills for pain.  My head really starts hurting and that is why I take the pills.

### Joe Arreola

I am currently in the Federal Correctional Institution, Yazoo City Low, in Yazoo, Mississippi.  I was in the BCDC for nine months beginning in March of 2007.

I remember a little bit about the incident with Rubio.  He asked for toilet paper and they immediately pulled him out of the pod.  Once he was pulled out, I could not see anything.  I did not see any hitting, kicking, or other body contact.  I could hear noises--like slapping sounds.

Rubio came back into the pod.  He looked a little mad.

I mind my own business.  I try not to get involved in things like that.

Rubio told me they hit him and threw him to the ground.  I do not really remember if they made him get on the ground.   A lot of times when the deputies came into the pod, they gave a verbal command for everyone to get on the floor.  You would get on your stomach or knees.

I do not remember Rubio requesting medication.

### Maci D. Davis

I am currently in the Federal Correctional Institution  in Yazoo, Mississippi.  I was in the BCDC from February of 2007 until April of 2008. I met Rubio at the BCDC.  We were in the same pod, but were not cell-mates.  I have not spoken to him about my testimony,  received any mail from him, or seen him since I was at the BCDC.

I recall the events of August 8, 2007.  Rubio went to the door and I heard him ask for toilet paper.   I heard him.  Rubio never went out of the pod.  I guess Larkin and another officer told Rubio to come back inside the pod and  Rubio again told them he needed toilet paper.  I guess they

-6-

got mad and they rushed in the pod.  We were playing spades at a table to the right when the deputies came into the pod.  I was maybe five or ten steps from Rubio.

Rubio saw them coming and turned back.  Larkin grabbed at him.  They told everyone to get on the ground.  I saw Larkin hit Rubio three or four times.  The first one was in the back of the head.  The other ones were to his upper body.  Rubio was standing when Larkin hit him in the back of the head.  Rubio fell against the wall.  He was slammed to the floor and hit in the upper body a couple of times.  He was then put in handcuffs and taken out.  Rubio did not resist the officers.

The other officer involved – whom I do not know – did not hit Rubio.  I do not know what happened after they took Rubio out in handcuffs.  I did not see him attacked after he was in handcuffs.

Rubio came back a week or so later and he showed me bruises on his ribs.  I know he was bruised up pretty badly.  They would not let him go to the doctor or the nurse.  I know he was definitely trying to see the nurse.  I am not aware he received medical attention.

I think Larkin is a racist and does not care for Hispanics.  I base this on his attitude and mannerisms.  I cannot say there were any specific problems with Rubio.

Before I left the BCDC, I heard about the charges Rubio was going to press.  He asked me if he should do it.  Rubio and I did not really get along, so he only mentioned it once.

*Shawn Sarver*

I am currently in the United States Penitentiary in White Deer, Pennsylvania.  I was incarcerated in the BCDC beginning in March of 2007 for about five months.  I was in the BCDC the same time as Rubio.  We played cards together, but I would not really say he was my friend.  I did not find out about this lawsuit until Friday of last week.  I have had no contact with Rubio since we were at the BCDC.

-7-

On the day of the incident, I was sitting at the very first table playing cards and Rubio was right there in front of me inside the pod, holding up the toilet paper roll at the window.  What he said was in Spanish and I do not speak Spanish, but I assume he was holding up the roll to get another roll of tissue.

Just one officer came into the pod.  The pod door was opened, and the officer rushed in and hit Rubio in the neck.  Rubio was pushed to the wall and then to the floor.  The officer picked Rubio up, body-slammed him onto the floor, and then the rest of the officers came in and Rubio was handcuffed.

Rubio was then escorted out of the pod.  You cannot see what happens outside the pod.  I did not hear anything.  You could probably hear loud noises but it is so noisy in the pod I honestly do not know.

Everyone in the pod thought it was odd the way it happened.  An officer came in there and did all this damage to Rubio over a roll of toilet paper.  I was able to hear everything but I do not understand Spanish.  I only saw one officer use force against Rubio.  Rubio had no clue anything was coming.  I have no clue as to why it would happen.  There were times the SERT (Special Emergency Response Team) would come in and slam us to the wall.

I do not think I was in the pod when Rubio came back from the hole.  I never saw any injuries.  I am not sure about Rubio's medical care.

***Elmer Rodriguez***

I am currently in a Federal Correctional Institution in Indiana.  I was in the BCDC in 2006.  I remained there for a year and a half.  I met Rubio in the BCDC and we became friends.  I last spoke to him about two years ago in the BCDC.

I was sitting at a table talking to a friend when Rubio went to the door and asked for toilet paper. He was inside the pod but the door was open. Rubio stepped outside the pod. He came back in because they would not give him any toilet paper. Rubio closed the pod door and then I saw Larkin approaching him. Larkin was the first deputy to come in the pod. There were two deputies at first and then a third one came in. Rubio was first thrown to the floor and then they started hitting him. I do not know how many times Rubio was hit but they beat him up. I remember all three deputies hit Rubio. Rubio was not resisting in any way.

I do not remember if Rubio was handcuffed when they took him out of the pod. I did not see or hear anything after he was taken out. I do not know why they would hit Rubio over toilet paper.

I really do not know if he got to see the doctor. I can remember him asking for medical care about his diabetes. Rubio wrote a request I think he showed it to me.

We did not talk about the incident after it happened. Rubio did tell me he was going to sue after he got back to the pod. I agreed to testify because I saw it.

I do not recall all the events that day. However, I know it did happen.

**_Deputy Dana Larkin_**

I work for the Benton County Sheriff's Department as a transport deputy, but previously worked in the jail. I was an instructor on pressure points and control tactics. The tactics are designed to take down inmates in a manner using the least force.

On August 8, 2007, there was an incident with Rubio. I made a record of the incident. _Defendants' Exhibit_ 2 in Civil No. 07-5156. Deputy Collins was on duty with me and we were letting inmates in D-150 out for recreation. When the inmates come out of the pods, they go

-9-

outside to a recreation area. I cannot recall how many inmates were in the pod. Usually, if the inmates have a chance to go outside, they go.

Rubio came out to pod-control asking for toilet paper. Toilet paper had been handed out the day before and also passed out at morning shift. We told Rubio to go back in the pod and he said – in English – "no I want toilet paper." I went down to where he was standing and grabbed his left arm to escort him back into the pod. He was told at least twice to return to the pod. Collins told him the first time. I told him the second.

I had to walk eight to ten feet to get to Rubio. Collins was standing to the left of me. When we started to go through the D-150 door, Rubio started resisting. He tensed up and balled his fist. I thought he was going to hit me. I immediately put him on the floor using a straight-arm bar take down technique.[1] You bend them straight down at the waist. The take down occurred right in the doorway. Other inmates could have seen it.

Collins was standing in pod control when this happened. When Rubio was on the ground Collins came and assisted in putting the handcuffs on. His hands were handcuffed behind his back.

Rubio was still acting aggressively so we placed him on his knees. He was staying real tense and not following direct commands. I still felt threatened by him so I wanted him on his knees. It looked like he was going to hit me. Placing an inmate on his knees gives him a minute or two to calm down and prevents the inmate from kicking us.

Rubio had refused to go to his knees so I delivered one knee strike to his right common peroneal located at the side of the leg. The technique is designed to cause motor dysfunction.

I did not hit, kick, or strike Rubio. I didn't slam him against the wall. He did hit the floor.

---

[1]This maneuver is designed to bring the inmate to the ground, face down, to allow handcuffing. See e.g., Wright v. City of Canton, Ohio, 138 F. Supp. 2d 955, 959 (N.D. Ohio 2001).

The force I used was consistent with my training and was a reasonable response given the situation. Rubio didn't complain that he was hurting.

Rubio was checked out to the lock-down pod, E pod. I then went back to my duties.

### *Deputy Casey Collins*

I have worked at the BCDC since October of 2005, as a corrections officer. I was working on August 8, 2007. The incident occurred about 7:45 a.m. I prepared an incident report. *Defendants' Exhibit* 1 in Civil No. 07-5156. We lined up the inmates for outside recreation. Rubio came out and crossed the red line. I told him he was not supposed to be out of the pod. He said he needed toilet paper. I ordered him back in the pod. Larkin stepped down and took Rubio's arm to escort him back into the pod. I saw Rubio tense up, ball his fist, and turn away from Larkin. Larkin placed Rubio on the floor using an arm-bar take down. I did not hear them hit the ground. It is not the intention of this technique to slam an inmate to the ground. It is just to move him in that direction. The inmate has another arm to pad himself when he goes down. Rubio did not hit the wall.

When Rubio was placed on the ground it was appropriate. I left pod control to assist. I handcuffed Rubio and then we each took an arm and escorted him eight to ten feet back to pod control. He was tensing up and very rigid. I do not recall him pulling against me. We were still worried he could harm us so we ordered him to his knees as a safety precaution. Rubio was ordered twice to get on his knees, but he did not comply. Larkin and I simultaneously delivered common peroneal knee strikes. This technique is used for motor dysfunction and balance displacement. The technique was used because Rubio was not complying.

Defendants' Exhibit 3 in Civil No. 07-5156 is the disciplinary action form that I filled out when the initial reports were written. Rubio was charged with refusing to obey the order of a

deputy.  When a disciplinary action form is written, the inmate is escorted to lock-down.  The sergeant then comes down and gets the documents and gives the inmate the opportunity to respond. The officers involved in the incident do not take part in the due process hearing.  Rubio was found guilty of disobeying an order and given ten days lock-down and loss of privileges.  The form indicates Rubio admitted to not going back into the pod when he was told to do so.

I did not hit, kick, punch, or slam Rubio in anyway.  I did the knee-strike at the same time as Larkin.  I knew it had to happen and we both did it.  Things can escalate out of control quickly and it is vital to maintain control for our safety.

I did not hear Rubio talk about being hurt or needing to see a doctor.

### Dr. John Huskins

I have been a physician for thirty-six years.  I have been employed as the jail doctor for four years.  I am also employed at Mercy Hospital.

I go to the jail three times a week.  I see all the patients on the list.  Generally, I do not see the inmate's requests or grievances.  I really do not remember Rubio.  I never refused to see him. I see anyone they bring in.  If I was not there, Rubio would have seen the nurse.

I use my independent judgment when deciding what care is needed.  When I see a patient, I make notes.   Defendants' Exhibit 1 in Civil No. 08-5011 contains my notes on Rubio.  I saw him on April 25, 2007, for diabetes.  *Defendants' Exhibit* 1 in Civil No. 08-5011 at page 3. He was prescribed Glucophage®[2] and placed on a diabetic diet.  *Defendants' Exhibit* 3 in Civil No. 08-5011.  There is a separate blood sugar chart to record the sugar levels.  *Plaintiff's Exhibit* 2 in Civil No. 08-5011 .  With diabetes, you are normally looking for high sugar levels.

---

[2]Glucophage® is the brand name.  Metformin is the generic name.

-12-

Reviewing the blood-sugar chart, I do not see any blood sugar levels that would cause me to change Rubio's medication. If he was consistently staying over 200, I would do something. One day over 200 would not do anything; Rubio should not have felt any symptoms.

Between September 6, 2007, and November 13, 2007, Rubio's blood sugar level was not monitored. *Plaintiff's Exhibit* 2 in Civil No. 08-5011. If Rubio did not have complaints, we would have stopped monitoring. On November 13th, Rubio's blood sugar level was 85. *Plaintiff's Exhibit* 2 in Civil No. 08-5011. We would monitor for a week or two and then only if he had complaints. He would continue to receive his medication. The medication he was on, Glucophage or Metformin, lowers the blood sugar level but does not increase the insulin level. If he went for several days without medication, his sugar would go up.

 Rubio was seen by the nurse on August 22, 2007. He was complaining of cracked feet and the nurse gave him hydrocortisone cream.

Rubio was next seen on September 3rd. He was complaining of a rash on his feet. I gave him a fungus cream.

Rubio was seen by the nurse on October 10th. He was complaining of itching feet and prescribed an anti-fungal cream.

I saw Rubio on October 17th. He was complaining of back pain and congestion in his eye. He was given Tylenol for a week and Benadryl®[3] for five days.

On October 26th, I saw Rubio for complaints of indigestion and sinus congestion. I prescribed Maalox and Benadryl for one week.

---

[3]Benadryl® is a brand name for diphenhydramine.

-13-

On November 9th, I saw him for complaints of headache and backache.  He also wanted his diabetes checked.  I prescribed Motrin®[4] and daily blood sugar tests.

On November 23rd, I saw Rubio for complaints of pain through his chest.  I prescribed Zantac®.[5]

Rubio was next seen on November 30th.  He complained of a headache and was prescribed Aleve®.[6]

On December 9th, I saw Rubio for complaints of shoulder, head, back, and knee pain.  I gave him Aleve for five days.

On December 13th, Rubio was seen by the nurse for complaints of constipation.  He was given Milk of Magnesia®[7] for three days.

I saw Rubio on December 16th for complaints of headache, chest ache, backache, and constipation.  I prescribed Milk of Magnesia and Aleve.

Rubio was seen by the nurse on December 19th for complaints of constipation.  He was again prescribed Milk of Magnesia.

On December 25th, I saw Rubio for complaints regarding his foot and aching all over.  I prescribed fungus cream and Aleve for five days.

I next saw Rubio on January 4, 2008.  He was complaining of a problem with his foot and of aching all over.  I prescribed Flexeril®[8] and fungus cream.

---

[4]Motrin® is a brand name for ibuprofen.

[5]Zantac® is a brand name for ranitidine.

[6]Aleve® is a brand name for naproxen.

[7]Milk of Magnesia® is a brand name for magnesium hydroxide.

[8]Flexeril® is the brand name for cyclobenzaprine.

-14-

Rubio was seen again on January 15th complaining of aching all over.  I prescribed Aleve for six days.

According to Defendant's Exhibit 1, the first time I saw Rubio was April 25, 2007.  The last time I saw him was on January 7, 2008.

I do not recall seeing him right after the incident.  When I saw him on September 3rd, he was only complaining of a rash on his feet.

I would not have refused to examine Rubio.  My routine practice is to do an examination.  If a patient reported being in a physical altercation and being hit in the head and chest, I would examine his head for fractures.  I would look to see if his pupils were even.  I would move the patient's limbs.  I would listen to breath sounds to exclude a punctured lung.

Most head injuries have some residual affect but I should have been able to pick that up from a physical examination.  If he had an increase in pressure, I would have had to put him in the hospital for a CT scan.  If he had swelling, we would have seen it.  If he had a hematoma, he would have had some serious symptoms.

There is no really good treatment for rib fractures.  X-rays would not have helped in this case.

I would not think a testicle injury would linger.  Usually such an injury resolves quickly.  Scar tissue could have formed and caused him some pain.

If a patient does not tell me he is not getting his medication, I would have no way of knowing it.  Rubio was seen two times in October, three times in November, and three times in December and he never said he was not getting his medication.

-15-

*Additional Records*

After the hearing, Defendants supplied the Court with three additional pages from Rubio's medical chart and one typewritten patient note regarding a visit to Dr. Huskins on August 13, 2007. The three additional pages from the medical chart indicate as follows: 2/27/2007--seen for diabetes and prescribed medication and diabetic diet;[9] 4/11/2007--seen for diabetes and a fungus and prescribed medication;[10] 4/25/2007--seen for diabetes and prescribed medication and diabetic diet; 5/7/2007--prescribed a regular diet and two snacks; 7/18/2007--seen for a foot fungus and prescribed medication; 8/6/2007--seen complaining his snack at night was too small--told the kitchen would be talked to; 8/13/2007--seen for complaints of back, neck, and knee pain and prescribed Tylenol.  Dr. Huskins' typewritten notes regarding the August 13, 2007 visit also indicate that Rubio reported having a previous surgery on his abdomen after an injury.  He complained that his scar stayed sore.

*Nurse Marsha Smith*

I am a registered nurse and have been employed by the BCDC for over three years.

Usually an inmate will fill out a medical request and let us know he is diabetic.  Plaintiff's Exhibit 2 in Civil No. 08-5011 are the logs that show when Rubio's blood sugar level was checked. We do four blood sugar checks a day if the inmate is on insulin.  Two checks a day are done if the inmate is on medication.  However, if the inmate has been on medication for a long time, the checks

---

[9] The date of this entry appears to be February 27, 2007.  However, if this date is correct, the record is apparently from a prior incarceration.  According to booking records submitted in connection with the summary judgment motions filed in these cases, Rubio was booked into the BCDC on April 12, 2007, and released on January 17, 2008.  Civil No. 07-5156 (Doc. 29, Exhibit 1 at page 1); Civil No. 08-5011 (Doc. 20, Exhibit 1 at page 1).

[10] The date on this record is April 11, 2007, one day before Plaintiff's admission date.  While the records indicate diabetic medication was ordered on this date, the medication logs indicate Plaintiff did not begin receiving the medication until after he was seen by Dr. Huskins on April 25th.  The records indicate Rubio began receiving medication on April 26th.

-16-

may only be done once a day.  The inmate usually sticks himself to perform the checks; we are only there to supervise.

The blood sugar checks are done at the nurse's station.  They are  usually scheduled, but if an inmate is having symptoms and he tells a deputy, the inmate will be brought to the station where there are supplies to check his blood sugar.

From the blood sugar logs, it looks like Rubio's blood sugar level was checked once a day from April 27th to May 2nd.  *Plaintiff's Exhibit* 2 in Civil No. 08-5011 at page 1.  On the top of this sheet, it indicates the doctor only ordered the checks for one week.  *Id.*

From May 2nd to May 7th, it looks like there were no checks.  *Plaintiff's Exhibit* 2 in Civil No. 08-5011 at page 2.  On the top of the sheet, it looks like it indicates the checks are only to be done once a week.  *Id.*  I do not know what that means without seeing the doctor's order.  The sergeants fill out the top of this sheet.  Some people on Metformin do not check their blood sugar at all unless they are having symptoms.

The doctor usually says to check an inmate's blood sugar level for a week.  Then I show him the log and he says if he wants it continued.  I put it back in Dr. Huskins' court to determine if the level needed to be checked.  The level was checked six times in May, once in June, three times in July, twice in August, once in September and then again on November 13th.  *Plaintiff's Exhibit* 2 at pages 1-4.  On November 9th, it was ordered that the checks be made once a day for seven days, but the only check done in November was on the 13th.  *Id.* at pg. 3.

The doctor decides whether blood sugar checks are warranted.  I write out the medication sheets so the deputies know what he ordered.  Sometimes an inmate will ask to have his blood sugar level checked.  This may be why there are random dates on Rubio's sheets.  All checks are recorded on these sheets.

-17-

The sergeants put medical requests in a basket.  I decide if an inmate gets to see the doctor or if I see him.  The decision is based on the inmate's complaints.

I write out the instructions on the medication sheets.  The deputies dispense the medication. Rubio's medication logs indicate he received Metformin twice a day.  *Defendants' Exhibit* 3 in Civil No. 08-5011.  He received the medication from April 26th to May 16th.  *Id.*  He received the medication again starting on May 23rd.  *Id.*   During this time period, I was not on day shift and another nurse was in charge of ordering medication.  I came in at 2:00 p.m.  When I am in charge of ordering medication, I check all blister packs once a week and see what I need to re-order.  I do not know what her method was.  The Metformin is a continuing medication; a new prescription from the doctor would not be required.

One week without medication could have made Rubio's blood sugar a little higher, but he was also on a diabetic diet, so he was not getting extra sugar.  His blood sugar level would need to be really high to cause symptoms.

Rubio did not receive Metformin from May 16th to May 23rd.  *Defendants' Exhibit* 3 in Civil No. 08-5011.  On May 8th, his blood sugar level was 193.  *Plaintiff's Exhibit* 2 in Civil No. 08-5011 at page 2.  On May 24th, it was 204.  These levels are not dangerous at all.

I do not recall seeing Rubio after he complained of being subjected to excessive force.  I do not recall any bruises.  I believe at that time I was the only nurse.

I saw him on August 22nd.  I do not recall if I saw any bruises.  If I had seen significant bruises, I would have noted that.  If he had been seen or treated already, I might not have made notations.

## II.  DISCUSSION IN CIVIL NO. 07-5156

Rubio maintains Larkin and Collins used excessive force against him.  Rubio was a convicted inmate, being held for the Arkansas Department of Correction.  "[T]he Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences."  Wilson v. Spain, 209 F.3d 713 (8th Cir. 2000)(citing Whitley v. Albers, 475 U.S. 312, 318-322 (1986)).  "The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result."  Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted).

The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."  Hudson v. McMillian, 503 U.S. 1, 9 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000) (quoting Hudson, 503 U.S. at 6-7).  To make this determination, the Court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate."  Jones, 207 F.3d at 495 (citations omitted).

-19-

Turning to an examination of the facts of this case, Rubio testified that the attack against him was completely unprovoked.  He stated he was first hit on the side of the face, then thrown to the floor, and finally hit and kicked all over his body.  Additionally, Rubio maintained that some blows were administered by Larkin after Rubio was handcuffed and on his knees.  Rubio testified that Larkin hit him in the head ten or fifteen times.  He asserted that he did not refuse to obey any orders and was not resisting in anyway.

Rubio's testimony is substantiated in part by the testimony of inmates Maci Davis, Shawn Sarver, and Elmer Rodriguez.  Davis testified that the deputies rushed into the pod and Larkin grabbed Rubio.  Davis indicated that Larkin hit Rubio three or four times – once on the back of the head and the other blows to his upper body.  Davis also testified that when Rubio came back into the pod he was bruised up pretty badly.

Sarver testified that Larkin hit Rubio in the neck and slammed him onto the floor.  This was the only use of force against Rubio that Sarver witnessed.  However, Sarver commented that everyone in the pod thought it was odd the way this incident happened –  all the damage to Rubio over a roll of toilet paper.

Rodriguez testified that as soon as Rubio closed the pod door Larkin approached him.  According to Rodriguez, Rubio was thrown to the floor and three deputies started beating him.  Both Sarver and Davis testified they only saw one officer, Larkin, use force against Rubio.

Inmate Joe Arreola testified that as soon as Rubio asked for toilet paper he was pulled out of the pod.  Although he couldn't see anything, Arreola testified he could hear slapping sounds.  This testimony contradicts that offered by Rubio, Davis, Sarver, and Rodriguez, who all testified that Larkin's initial use of force against Rubio occurred in the pod or pod doorway.

-20-

Larkin testified Rubio came out to pod control asking for toilet paper and refused at least two orders to return to the pod.  When Larkin attempted to escort Rubio back to the pod, Larkin testified Rubio started resisting, tensed up, and balled up his fist.  Larkin indicated he believed Rubio was going to hit him so he used a straight-arm bar take down to place Rubio on the floor. After he was handcuffed, Larkin testified Rubio continued to act aggressively and as a result he and Collins utilized a knee strike to force Rubio down.

Larkin and Collins both testified that Rubio refused repeated orders to return to the pod. Rubio was found guilty of a disciplinary violation of failing to obey the orders of the deputies. Rubio testified that after his request for toilet paper was refused,  he continued to tell the officers he needed to use the restroom and alternatively ask if he could retrieve the toilet paper from his cell.  Additionally, Rubio's disciplinary violation form indicates that he admitted disobeying orders to return to his pod.  The Court believes the disciplinary violation conviction together with the testimony of Rubio, Larkin, and Collins establishes that Rubio refused orders given to him.

It is undisputed that both Larkin and Collins used some amount of force against Rubio. Given a repeated refusal to obey orders, it would not be unreasonable for Larkin or Collins to utilize a reasonable amount of force in an effort to make Rubio comply with their orders.

In Whitley, 475 U.S. at 319-20, the Supreme Court stated:

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes  was unreasonable, and hence unnecessary in the strict sense. [Rather, it] is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

-21-

The Court finds that Rubio has failed to prove by a preponderance of the evidence that Larkin repeatedly hit or struck him.  The evidence establishes Larkin took Rubio to the floor and also, with the assistance of Collins, utilized a control tactic to place Rubio on his knees.

Rubio testified that Larkin struck him ten to fifteen times in the head.  We find this testimony not to be credible.  First, the testimony of Rubio's inmate witnesses did not support Rubio's testimony.  As noted above, Davis testified that he saw Larkin hit Rubio three or four times but only one strike was to his head.  Sarver testified he remembered one hit on Rubio's neck and his being slammed to the floor.  With respect to the third inmate witness, Rodriguez testified Rubio had been beaten; however, he stated he did not know how many times Larkin struck Rubio and recalled three deputies striking Rubio.   The fourth inmate witness, Arreola, testified any use of force occurred outside the pod where he could not see.  Rubio's own witnesses do not support his testimony that Larkin hit and kicked him ten to fifteen times.

Second, while the extent of the injury is only one factor to be considered, we believe that if Rubio had been kicked in the head ten to fifteen times he would have sustained noticeable injuries to his head or neck.  Although Davis testified he saw bruising on Rubio's ribs, no witness testified Rubio had sustained injuries to his head or neck.

With respect to Larkin, we believe the credible evidence establishes that Larkin struck Rubio once or twice in the neck or head, took him to the ground, and utilized a common peroneal knee strike.  At the time, Rubio had refused orders to return to the pod.  Both Collins and Larkin testified Rubio tensed up and balled up his fist.  We find this testimony credible.

Under the circumstances, we do not believe the Defendants, in applying force, acted solely because Rubio was not complying with their orders.  See Treats v. Morgan, 308 F.3d 868,

875 (8th Cir. 2002)(force may be justified to make an inmate comply with a lawful order only

if the inmate's noncompliance poses a threat to other persons or to prison security); <u>Hickey v.

Reeder</u>, 12 F.3d 754 (8th Cir. 1993) (correctional officers do not have a blank check to use force

whenever a prisoner is being difficult).  Instead, we conclude Larkin and Collins reasonably

believed that a threat to officer safety existed as well as a threat to the order and control of the

facility.  Certainly, we cannot say that Rubio has established, by a preponderance of the evidence,

that either Defendant acted wantonly or maliciously.  Larkin and Collins are therefore entitled

to judgment in their favor.

### III.  DISCUSSION IN CIVIL NO. 08-5011

Rubio maintains he was denied adequate medical care by Dr. Huskins.  Specifically,

Rubio contends Dr. Huskins did not give him an in-depth examination following the use of force

by Larkin and Collins.  Rubio also maintains x-rays should have been taken to determine whether

he suffered any internal injuries.  Finally, Rubio maintains his diabetes medication was not

always provided to him.  Instead, he contends there were periods of time when the medication

was not available.

To prevail on an Eighth Amendment denial of medical care claim, Rubio must prove that

Defendant acted with deliberate indifference to his serious medical needs.  <u>Estelle v. Gamble</u>,

429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard

includes "both an objective and a subjective component:  'The [Plaintiff] must demonstrate (1)

that [he] suffered [from] objectively serious medical needs and (2) that the prison officials

actually knew of but deliberately disregarded those needs.'" <u>Jolly v. Knudsen</u>, 205 F.3d 1094,

1096 (8th Cir. 2000)(quoting  <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir.1997)).

-23-

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.   Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."   Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

Inmates have "no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Dulany, 132 F.3d at1239.   "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992).

Rubio's claims regarding his care following the use of excessive force fail for a number of reasons.   First, the question of whether Rubio was in need of x-rays or a more in-depth examination are questions of medical judgment and do not establish deliberate indifference. Estelle, 429 U.S. at 107 (medical decision not to order x-rays does not constitute cruel and unusual punishment); Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987)(showing that another physician in the same circumstances would have ordered different tests and treatment raises question of medical judgment and does not show deliberate indifference).   Second, even if Dr. Huskins was negligent in regard to his treatment or mis-diagnosed Rubio's condition, this does not state a valid claim under the Eighth Amendment.   McRaven v. Sanders, 577 F.3d 974, 982 (8th Cir. 2009).   Third, Rubio has not established that Dr. Huskins actually knew of, but

-24-

deliberately disregarded, Rubio's substantial medical needs.  Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009).

When Rubio was seen on August 13, 2007, for complaints of back, neck, and knee pain, he was prescribed Tylenol.  On October 17th, Rubio was seen again for complaints of back pain and was prescribed Tylenol.  The evidence establishes that each time Rubio complained of pain he was prescribed some type of pain relieving medication.

Since his incarceration in the BCDC, Rubio testified he has been in other detention facilities in Arkansas, Georgia, and Illinois.  No medical personnel at these facilities have found it necessary to conduct an in-depth examination of Rubio or to order other diagnostic tests due to his complaints of continuing pain.  There is no evidence that the failure of Dr. Huskins to conduct a more in-depth examination or to order x-rays harmed Rubio in anyway.

Rubio's claim regarding the provision of his diabetes medication also fails.  Rubio was seen by Dr. Huskins on April 25, 2007, and prescribed Glucophage.  *Defendants' Exhibit* 1 in Civil No. 08-5011 at page 4.  According to the medication logs, which Rubio did not maintain were inaccurate, he began receiving the medication the following day, April 26th.  *Defendants' Exhibit* 3 in Civil No. 08-5011.  With the exception of May 16, 2007, to May 23, 2007, the logs show Rubio received the medication throughout his incarceration.  *Id.*

With respect to the eight days Rubio was without medication, Nurse Smith testified that one week without his medication may have slightly increased Rubio's blood sugar level.  However, she stated Rubio was on a diabetic diet so he was not getting any additional sugar.  Moreover, she noted that there was little difference between his blood sugar level on May 8th, 193, and May 24th, 204.  She indicated these levels were not dangerous at all.

While it appears his blood sugar levels were checked on an intermittent basis, *Plaintiff's Exhibit* 2 in Civil No. 08-5011, there was no evidence that Rubio brought this to the attention of Dr. Huskins or Nurse Smith.  *See e.g., Plaintiff's Exhibit* 1 in Civil No. 08-5011.  Although Rubio submitted numerous medical requests and grievances, none mentioned the need for more frequent checks or the failure on the part of anyone to allow him to check his blood sugar levels. *Id.*

There is no evidence that the failure on the Defendants' part to order more frequent checks or to have the checks performed on a routine basis harmed Rubio in anyway.  In this regard, Dr. Huskins testified that if Rubio did not complain, they would stop monitoring his blood sugar level.  After a review of Rubio's blood sugar chart, Dr. Huskins testified he did not see any blood sugar levels that would cause him to change Rubio's medication.

For the reasons stated, we conclude Rubio has failed to establish that Dr. Huskins acted with deliberate indifference to his serious medical needs.  Dr. Huskins is entitled to judgment in his favor.

## IV.  CONCLUSION

With respect to the excessive force claim asserted against Larkin and Collins in Civil No. 07-5156, judgment will be entered in their favor.  With respect to the denial of adequate medical care claim asserted against Dr. Huskins in Civil No. 08-5011, judgment will be entered in his favor.

Dated this 26th day of May 2010.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-26-